Tom NOEL and Sue Noel,
Plaintiffs–Respondents

v.

Loren MARCUM, Lorene Marcum, and
Sherry Marcum, Defendants–
Appellants

No. 18462.

Missouri Court of Appeals,
Southern District,
Division One.

July 19, 1993.

M. Sean McGinnis, C. Bradley Tuck, Joseph P. Winget, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for defendants-appellants.

Andy B. Hodges, Springfield, for plaintiffs-respondents.

PARRISH, Chief Judge.

Loren Marcum, Lorene Marcum and Sherry Marcum (defendants) appeal from a judgment entered in favor of Tom Noel and Sue Noel (plaintiffs) for property damages sustained when a dog that had been kept in a cage located outside defendants' residence got out of the cage, went to plain-

tiffs' house, jumped through a window into the house and attacked plaintiffs' dogs. Plaintiffs' dogs were injured and their house damaged. This court affirms.

David Baum owned two dogs. He frequently kept them in a cage that was located on property defendants occupied as their residence in Springfield, Missouri. Prior to July 1, 1989, David Baum had dated defendant Sherry Marcum. From time to time the dogs would be left in a pen that was located at the residence of defendants. On July 1 David Baum and Sherry Marcum had a disagreement. He was told to take his dogs and not bring them back. Loren Marcum, Sherry's father, testified:

I told him to take the dogs and not bring them back, but he would bring them back periodically or to leave them there whenever he wanted to go out or do something, you know, he'd always using [sic] that cage. And I never tore it down. So I didn't mind it until I got— finally got tired of having them dogs there and have to go out and give them water and stuff, because they'd sit out there for a day or two without water, so we'd give water. And I told him on the first, I said, "David, don't bring these dogs back." In fact I said, "I don't want you back here."

He was then asked the following questions and gave the following answers:

Q. Now let's be more clear to the judge. What you're referring to is a blowup that your daughter and David Baum had, correct?

A. Right.

Q. And when you say the first, of what month?

A. First of July.

Q. So that was two days before this incident occurred?

A. Right.

Q. And if I understand your testimony, you told David Baum, "Don't come back and don't bring your dogs."

A. I sure did.

Loren Marcum was asked how he became aware that the dogs were back in his yard on July 3. He answered:

Went out into the yard in the evening about 4 o'clock and they was out there. And I went over and looked and they didn't have any water. I guess David had brought them in because I sit in there, watch my TV. I don't watch what's going on outside. And I got them some water and fastened them back up. And the next thing I knowed whenever I heard about dogs, a police officer called me from the police station and asked me if we had dogs there, you know, and I told him yeah. And he said, "Well, check and see if they're in the—if you've still got them." And I walked out there and the dog pen was opened and the dogs were gone.

Mr. Marcum testified that David Baum had not asked permission to leave his dogs at the Marcum property on July 3; that he secured the gate lock after he had watered the dogs that afternoon. He did not know how the dogs got out of the pen.

Plaintiffs had been away from their house the afternoon of July 3, 1989. They were called and told "that a pit bull had broken in the house and we should come home right away." Sue Noel was asked about what she found when she returned to her residence. The following questions were asked and answers given.

Q. What happened?

A. [By Mrs. Noel] Well, when we came home Troy was all upset and the house was—

Q. Troy is your son?

A. Yes. And the house was a total mess. There was blood everywhere, dog poop in the living room, family room.

.    .    .    .    .

Q. Your two dogs were in there still?

A. Yeah.

.    .    .    .    .

Q. I understand they were pretty chewed up.

## A. Yes.

Plaintiffs incurred veterinarian bills. Mrs. Noel testified that the damages to plaintiffs' house included blood on the walls—"You could see chunks of dog hair from one of our dogs on the floor." There was dog hair "plastered on the wall." It was "three-quarters of the way up the wall." There was blood on a sofa—"it was covered full of blood." Business papers that had been on a desk were blood-covered. A television set had been knocked over and broken. There was a hole in the window screen where the dog had jumped into the house. The kitchen appliances had blood on them. Kitchen chairs were knocked over. There was "a big pool of blood" in the middle of a bed and on curtains in Mr. and Mrs. Noel's bedroom. There was blood on the toilets in two bathrooms. Another bedroom had blood on the bed, curtains and carpet.

Section 5–28 of the city ordinances of Springfield, Missouri, provides:

(a) It shall be unlawful for any person owning, controlling, harboring, possessing, or having the management or care of any dog to permit such dog to run at large on, of, from the premises of such person. Every dog, when on any street, alley, park, schoolground, or any other public place in the city, which is not attached to a leash, the other end of which is securely held by a person, shall be deemed running at large. Every dog, when on private property within the city, which is either not attached to a leash the other end of which is securely held by a person and the leash is of sufficient length and the conditions are such that the dog cannot leave the premises, or which is not so confined by fences or other enclosures so as to prevent its straying from the premises, shall be deemed running at large.

.    .    .    .    .

The ordinance provides a fine for its violation.

Defendants present one point on appeal. Defendants contend that the trial court erred in awarding judgment to plaintiffs because there was insufficient evidence that they "owned, controlled, harbored, possessed, or had the management or care of any dogs." They argue that they were not "within the class of individuals the ordinance controlled and restricted."

Our review of a court-tried case is governed by Rule 73.01(c) and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). In cases tried without a jury, the judgment of the trial court shall be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32.

.    .    .    .    .

In determining the sufficiency of the evidence, this Court accepts as true the evidence and inferences from it favorable to the trial court's judgment and disregards contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989).

*Automobile Club Inter–Insurance Exchange v. Chamberlain*, 839 S.W.2d 378, 380–81 (Mo.App.1992) (footnote omitted).

In order for a violation of a statute or ordinance to constitute negligence at least four prerequisites are necessary: (1) there must in fact be a violation; (2) the injured party must be within the class of persons intended to be protected by the ordinance or statute; (3) the injury complained of must be of such character as the statute or ordinance was designed to prevent and (4) the violation must be the proximate cause of the injury, i.e.: "but for" the violation the injury would not have occurred. Endicott v. St. Regis Investment Company, Mo., 443 S.W.2d 122[1, 2]; Downing v. Dixon, Mo., 313 S.W.2d 644[4–11].

*Sayers v. Haushalter*, 493 S.W.2d 406, 409 (Mo.App.1973).

Defendants' complaint is directed to the first prerequisite. Defendants argue that they did not own, control, harbor, possess or have the management or care of the dog

or dogs that caused plaintiffs' damages; that, therefore, they did not violate the ordinance.

Although the owner of the dogs that were at defendants' property had been told not to leave them there, when the dogs were discovered in the pen the afternoon of July 3, defendants did not report the dogs as abandoned animals or otherwise attempt to place them in control of the police or any animal control agency. Loren Marcum checked on the dogs, "got them some water and fastened them back up." Defendants treated the dogs the same as they had treated them on other occasions when their owner left them at defendants' property. Loren Marcum's actions the afternoon of July 3 after he discovered the dogs in the pen on his property, together with evidence presented at trial that the dogs had frequently been left in the care and control of defendants at the same location in the same facility, provided sufficient evidence for the trial court to find that defendants had the management and care of the dogs.

Cases on which defendants have relied are distinguishable from the facts in this case. *Steinberg v. Petta*, 114 Ill.2d 496, 103 Ill.Dec. 725, 501 N.E.2d 1263 (1986), was a dog-bite case. The dog owner's lessor was sued. The court held that the lessor was not liable for the injuries. There was no showing that the lessor had exercised any control or care over the dog. The lessor testified at trial that he had not known about a fence that had been placed on the leased property or about the dog being kept there until after the injury occurred. In this case defendants knew about the pen in which the dogs had been kept on their property—it was defendants' pen. Likewise, defendants knew of the dogs' presence.

In *Thompson v. Dawson*, 136 Ill.App.3d 695, 91 Ill.Dec. 586, 483 N.E.2d 1072 (1985), a stray dog that had been jumping on persons leaving a church was taken from the church by James Stubblefield and released at Stubblefield's property. The dog roamed freely. Mr. Stubblefield intended to find a home for the dog or to take it to an animal shelter. Mrs. Stubblefield made food and water available. She put it under a tree. She testified that she could not stand to see a dog go hungry. The Stubblefields had a dog of their own. It slept in the basement of their home during the nighttime. The stray dog was not kept with the Stubblefields' dog.

While the stray dog was roaming to and from the Stubblefields' property, it ran in front of a motorcycle and was struck. The rider and passenger on the motorcycle sued the Stubblefields. They sought damages for injuries they sustained as a result of the collision with the dog. The lawsuit was based on an Animal Control Act. The court concluded that the Stubblefields were not the owner of the dog and that, for purposes of the applicable statute, were not its "keeper," saying, "*Whether or not a person is a keeper depends upon the peculiar facts and circumstances of each individual case.*" 91 Ill.Dec. at 589, 483 N.E.2d at 1075. The court further pointed out, "A person who treats a dog as living at his house, *and undertakes to control his actions,* is the owner or keeper within the meaning of the law; but the casual presence of an animal on his premises, if not so treated, does not constitute him such owner or keeper." *Id.* In this case, there was evidence that the presence of the dogs that were in the pen at Mr. Marcum's residence was more than a casual presence.

*Heyen v. Willis*, 94 Ill.App.2d 290, 236 N.E.2d 580 (1968), held that landowners who permitted a third-party to place cattle on their property pursuant to a lease or license were not "keepers" of the cattle. In this case, the pen where the dogs were kept was not leased to or in any manner under the control of the owner of the dogs.

Defendants' point is denied. The judgment is affirmed.

CROW, P.J., and SHRUM, J., concur.